Mariano Vervena, Admr. *vs.* William H. White.

JANUARY 10, 1917.

Present: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1) *New Trial.*

As a result of the decisions relative to the powers and duties of trial judges in passing upon motions for new trials two rules have been established; 1, that when the evidence is nearly balanced or is such that different minds would naturally and fairly come to different conclusions thereon, the trial judge has no right to disturb the findings of the jury, although his own judgment might incline him the other way, but 2, when his judgment tells him that the verdict is wrong, because it fails to respond truly to the real merits of the controversy, and to administer substantial justice, and is against the fair preponderance of the evidence, then his duty is to set aside the verdict.

(2) *New Trial.*

Where, from an examination of the evidence the court cannot say, either that the trial judge was clearly in error in granting a new trial, or that his con-

clusion was founded upon such material error as to what the evidence was, as to render his decision clearly erroneous, his finding will not be disturbed.

TRESPASS ON THE CASE for negligence. Heard on exceptions of defendant and overruled.

JOHNSON, C. J.   This is an action of trespass on the case for negligence brought by the plaintiff administrator to recover damages for the death of Antonio Nieddu, alleged to have been caused by the negligence of the defendant's servant in driving an automobile upon the main road in the village of Harmony, Rhode Island, at about 5:30 p. m., on December 25, 1913.

The case was tried in the Superior Court before a justice of said court and a jury, and on the 7th day of May, 1915, the jury returned a verdict for the defendant. The plaintiff's motion for a new trial was granted by the trial judge. To this decision the defendant excepted, and duly filed his bill of exceptions, with a transcript of the evidence. The case is before this court on said exception.

From the evidence it appears that the plaintiff's intestate on December 25, 1913, with seven other men left the Harmony Hotel about 5:30 o'clock P. M., and walked eastward on the main road toward Greenville. The men were Italians who were employed in the construction of an electric railway from Greenville to Chepachet. They had been at the hotel for an hour or more shortly before the accident. There was testimony that while there they all drank beer; that some drank beer and others cider; and as to the plaintiff's intestate that he drank only cider. There was no testimony that any of them was intoxicated, and there was testimony that they were sober when they left the hotel. The night was cloudy and dark and there were no street lights. East of the hotel, in the village of Harmony, on the south side of the road were a house and barn owned by Henry F. Whipple. On the north side of the road opposite said house and also opposite a part of the barn a ledge of rock extended out to

the edge of the roadway. Adjacent to the ledge on the east was a grass plat skirting said road. Along the southerly side of said road was the newly constructed electric railway line from Greenville to Chepachet. About one hundred and forty feet eastward from the barn was the junction of the Mapleville road and the main road through the village of Harmony, which junction was near the brow of a slight hill. The automobile of the defendant traveling westward met the men, walking in groups, passed the first group and passed the following group safely with the exception of the plaintiff's intestate who was struck by it and injured so that he died in a few moments.

Among plaintiff's witnesses were four of the intestate's companions on the night of the accident whose testimony was taken by deposition, nearly a year after the accident, some of them being out of this State, having gone to other places of employment. The testimony of these witnesses was substantially that the men were walking along in groups in the road near the railway track. The men saw the lights from the approaching automobile coming up the hill and as it reached the level part of the roadway the first group ahead turned their course to the right toward the electric car track and were passed by the automobile. The men behind the first group testified that when the automobile had passed the junction of the Mapleville road and Greenville Turnpike it was coming very rapidly and did not slacken its speed, but when at a point west of the said junction turned its course suddenly to the south part of the road directly toward the men walking along, thus necessitating their jumping out of its path.

Addio Giovanna Maria testified that he was walking about a foot and a half from the left rail of the track. That there were seven of them together; that they walked three in front and four behind and that he and Nieddu were the last ones; that Nieddu was on his left side about two feet behind him; that when he saw the automobile it was right in the middle of the road and "all at once when we never

expected it, it turned right into us;" that when he saw the automobile coming "it was running as fast as a train goes;" that "in about three seconds after we seen it, it was right on us;" that he turned to the right hand side; he said: "Antonio Nieddu was on my left and he had no chance to escape for there was no time for him to move as at the same time I turned backwards to look and I seen Antonio's body lying in the road." Asked where the automobile was when he saw Antonio's body he said that the automobile turned right onto the center of the road about thirteen feet from Antonio and that was where it stopped. He said the three men in front of him jumped off to the right.

Antonio Sotgia testified: "As we were coming from the town an automobile was coming at a terrible speed and we all tried to get to the tracks and Antonio was caught." He said that Nieddu was in front of him and when he saw him run for the tracks the auto struck him; that the road was more than eight meters wide.

Torchi Luigi testified that Nieddu was near him, less than a meter from him on his left; that the automobile when he first saw it was coming straight and then it turned towards them; that it was coming extraordinarily fast; that he jumped onto the tracks; that after he jumped Nieddu was near him; that next time he saw him he was dead.

Inziana Nicolo testified that he was walking about a foot from the rail; was right in front of Nieddu; that when he first saw the automobile it was running in the middle of the road; that it so continued for about a second and then turned toward him and the other men; that it was going as fast as a fast train; that as the automobile came toward him he jumped from the track to the middle of the road; that he did not see Nieddu when he was hit; that he heard the crash and turned right around and saw one wheel go over him; that the automobile stopped on one side after it turned toward the center of the road, about eight or nine feet from Nieddu.

Henry Picard, the chauffeur, testified that after striking the man he stopped the machine with the foot brake in about the distance of twenty feet from the point of contact, and put on the emergency brake only after he had stopped the car. Picard further testified that he saw the group of Italians as he was coming up the hill, and at the foot of the hill; that the lights shone on them; that he thought there were seven or eight; that as he was coming up they were walking about in the middle of the road and one of them started to jump in the road and wave his hands up and down; that he slowed the car down to about twelve miles and they got out of the way, stepping into the car track; that farther on there was another man that was alone who started to jump in the road, but right after crossed over to the chauffeur's right hand side, leaving the road clear. He says: "As I approached him I knew he was on my right hand side, walking; there was nothing on the left;" that he, Picard, slightly turned to the left so as to allow this man to have a little more room "and as I got up to him, the first I knew which was about on the level with the top of the radiator was a dark form and as I saw it, it struck him between the two lights."

Mr. White, the defendant, testified that he saw a man dancing in the road and after that saw a man coming around the ledge of rocks and swinging over into the grass plat on the right hand side. Asked, "What did he do?" he answered: "He came along the road straight a very short distance and then immediately sprung into the middle of the road. He sat up like a boy playing leap frog and then he went out of my vision over the radiator, and just then a thud came when we struck him."

Mrs. White, the wife of the defendant, testified that the automobile passed a group of men as they were approaching Mr. Whipple's barn; that after passing this group she saw "A man dancing in front of the car. He was sitting down, just about half his natural size;" and also, "that he was nearly doubled up, sitting down, dancing from one side of the

car to the other about in the middle of the road, with his arms up this way." As to the group of men after the first group, she said: "There was this man dancing sitting down, and directly from the left towards our right came a man and passed entirely by the car, and directly the man springs up, head foremost, and goes directly into our car, our car hitting him." "Q. Was he alone? A. I think he was. I don't know. I think that was the man that was dancing that was sitting down. I am not sure of that but I have always thought he was the same man." Asked how many men were in that second group, she answered: "There was one directly in front of the car, and one man came from the left and one to our right, and another man came out from our right. I think he was the man that was dancing. I am not sure. I couldn't tell whether there were two or three." Another witness also· testified that a man came across from the left crossing over toward the railway track in front of the machine and that he was dancing in front of the machine when he was struck.

The evidence was sharply conflicting and the case was properly submitted to the jury both as to the negligence of the defendant and the contributory negligence of the plaintiff's intestate. In his decision the judge said: "A view was taken at the time of the trial by the court and jury. In my opinion, in view of all the conditions, the jury could not have failed to find there was negligent management of the automobile, unless they lost sight of some of the testimony,—

"It was quite dark at the time; the roadway was narrow; the ledge prevented escape from the road on the northerly side, and a place of danger, in the presence of the track, lay on the southerly side; a group of eight men had been seen both by the chauffeur and by Mr. White walking in the roadway; there was curve in the road.

"Those in charge of the automobile appear to have had little or no regard for the men, for the horn was not sounded, if at all, until the machine was upon them. As the machine,

moving at twelve miles an hour in the dark, arrived at the point where the men were, it made a turn into and among them.

"The defendant, however, argues that even if the defendant's chauffeur was guilty of negligence in managing the machine, the plaintiff cannot recover because the negligence of the deceased contributed to the accident.

"It is said by some of the defendant's witnesses that the deceased danced around, swinging his arms, crouching down and going through other performances in a spirit of bravado, and thus met death by his own negligent conduct. According to the testimony of Mr. Buxton, who testified in behalf of the defendant to the negligent conduct of the deceased, the machine was only fifteen feet from the deceased when he first saw him dancing and swinging his arms. According to the testimony of the chauffeur, the machine was moving twelve miles an hour when it struck the deceased. Thus Mr. Buxton had less than one second to observe the action of the deceased.

"Mrs. White testified to similar conduct on the part of the deceased, and she observed him when at a greater distance away, but not until after the machine had passed the junction of the Mapleville road, at which point the machine was moving twenty miles an hour. This junction was 140 feet from the place of accident. At just what point the machine had been brought down to twelve miles an hour is not quite clear. At the junction it was moving at twenty, and at the time of accident, twelve. At best she could not have had more than two to three seconds to observe his action. When it is remembered that it was dark, and that she sat in the rear seat of the machine, it is highly improbable that she can form a distinct idea of his actions. The deceased was a man about forty years of age. Such conduct on the part of a man of that age is contrary to what we are led to expect. The testimony of these witnesses should be weighed with great care. It is much more probable that the automobile came suddenly, unobserved, upon

this man, and that he in his frantic efforts to escape, presented the appearance to these witnesses of one performing as they testified he did. This would be natural and what we might reasonably expect from him, and explains his conduct and their testimony. Such is the explanation given by some of the witnesses called by the plaintiff.

"The verdict in this case is far from satisfactory. In my opinion the case should be laid before another jury."

This court in *Wilcox* v. *R. I. Co.*, 29 R. I. 292; *Noland* v. *R. I. Co.*, 30 R. I. 246; *McMahon* v. *R. I. Co.*, 32 R. I. 237, has considered and discussed the powers and duties of trial judges in passing upon motions for new trials.

In *Noland* v. *R. I. Co.*, *supra*, where the trial judge had disapproved of the verdict of a jury and granted a new trial the court said: "Moreover, when the verdict of a jury has been disapproved by the judge who presided at the trial, and a motion for a new trial has been granted by him on the ground that the verdict fails to administer substantial justice, such exercise of his power will not be disturbed by this court unless it clearly appears that such conclusion of the trial judge is erroneous."

In *McMahon* v. *R. I. Co.*, *supra*, the court speaking of the distinction between the proper exercise of the power of a court of last resort, in granting new trials, and the proper function of the trial court in granting new trials when the trial judge has had the advantage of seeing and hearing all the witnesses before a jury, said: "This distinction is clearly pointed out in the case of *Wilcox* v. *Rhode Island Co.*, 29 R. I. 292, wherein this court cited with approval the language of the opinion in *Dewey* v. *Chicago, etc., Ry. Co.*, 31 Iowa, 373, in which the court pointed out in the clearest language the different rules as to granting new trials, which are applied respectively in courts of last resort, where the case is heard only on the written transcript, and in the trial court, where the judge has had the advantage of seeing and hearing the witnesses; and the language of the opinion in speaking of the duty of the trial court, which we wish to

emphasize, is as follows: 'Those courts ought to independently exercise their power to grant new trials, and, with entire freedom from the rule which controls appellate tribunals, they ought to grant new trials whenever their superior and more comprehensive judgment teaches them that the verdict of the jury fails to administer substantial justice to the parties in the case. Whenever it appears that the jury have from any cause, failed to respond truly to the real merits of the controversy, they have failed to do their duty, and the verdict ought to be set aside and a new trial granted.' "

Defendant's counsel urge that the verdict is not against the evidence; that the trial justice does not find that it is; that he does not say that the verdict fails to administer substantial justice; and that he does not say that the jury could not properly find as they did.

In *Humes* v. *Schaller*, 39 R. I. 519, decided November 20, 1916, the defendant based a claim of error in the denial of a motion for a new trial on a portion of the rescript of the trial judge, viz.: "Defendant says that the preponderance of the evidence is that plaintiff stepped suddenly in the way from behind the stalled truck. Suppose I do believe that this is more probable than that defendant's driver ran down a man in plain sight; it is a question of fact which has been passed upon by the tribunal appointed to try questions of fact. Motion for new trial denied." The court said: "The defendant urges that by this language the trial judge refused to consider whether the jury had responded to the real merits of the controversy, and whether the verdict failed to do justice between the parties, because apparently of the opinion that he had no power to do so." The court then speaking of the cases which we have cited, *supra*, said: "From them two rules emerge, namely; 'when the evidence is nearly balanced, or is such that different minds would naturally and fairly come to different conclusions thereon, he has no right to disturb the findings of the jury, although his own judgment might incline him the other way;' but

when his judgment tells him that the verdict is wrong, because it fails to respond truly to the real merits of the controversy and to administer substantial justice, and is against the fair preponderance of the evidence, then his duty is to set aside the verdict.

"These rules have been referred to and affirmed in numerous cases since those above cited. We think it should not be inferred that the trial judge was not informed as to these decisions, but that being aware of them, he has intended to imply that in his judgment the evidence in this case places it in the first class, where the verdict of the jury is to be accepted as conclusive as to the facts. We say this while recognizing the fact that the language of the rescript is not as discriminating and clear on this point as it might be."

This language is, *mutatis mutandis*, clearly applicable to the case before us, although the dissatisfaction of the judge with the verdict in this case is clearly indicated in his decision. We will not quote it again, but it may be noted that he says: "In my opinion, in view of all the conditions, the jury could not have failed to find there was negligent management of the automobile, unless they lost sight of some of the testimony." Then as to the testimony of witnesses as to contributory negligence, he says: "The testimony of these witnesses should be weighed with great care," and finally he says: "The verdict in this case is far from satisfactory. In my opinion the case should be laid before another jury." We think the language of his decision shows that the trial judge intended to imply that in his judgment the evidence in the case placed it in the class where under the cases cited, it was his duty to set aside the verdict.

Defendant's counsel however strongly urge that the decision of the trial judge is founded upon numerous errors in material particulars of what the evidence in the case really was. The first such mistake alleged is the statement in the decision that "the defendant's chauffeur was in some hurry to get to Chepachet where he hoped to catch a conveyance to his home." The testimony was that the destination was

Oakland and not Chepachet. In that respect the judge's statement was not in accord with the testimony. We find no direct statement in the testimony that the chauffeur was in a hurry and the judge did not state that there was. The judge's statement must therefore have been his inference from the testimony as to the speed and the management of the car by the chauffeur and as to the time allowed to go from Providence to the intended destination.

The second error alleged is the statement in the decision that "the ledge prevented escape from the road on the northerly side." The testimony does not definitely fix the place of the accident with reference to the ledge, although it places it generally in front of the middle of the Whipple barn. Waterman, the engineer, testified that the distance from the point where the Mapleville road comes into the main road to a point in front of the middle of the Whipple barn was about 140 feet; and the width of the road at the point opposite the trolley pole in front of the barn, from the gauge line of the rail to the edge of the traveled way was $17\frac{8}{10}$ feet. Walter R. Dexter testified that the automobile stopped "right in front of the barn or at the end of the barn;" that the roadway was about 20 feet wide with the rails. Jesse L. Tucker testified that the road was about 20 feet wide with the car track, and that on the north side opposite the Whipple barn there is a stretch of grass "after you go around the ledge." Henry Whipple testified that he went out the large barn door; that it was towards the west side; that the road was about 20 feet wide between the track and the ledge; that the automobile "stopped about between the railroad track and the ledge." Mrs. Whipple testified that she heard a scream, heard an automobile stop and went out on the piazza. She said: "I saw the automobile drawn up next to the ledge" and "it was on the opposite side across the road from my house." William L. Jacques testified that after the accident "the front end of the machine was about opposite that ledge, not exactly diagonal, but something that way, to the right-hand side of the road." Picard

testified that the car after the accident was about a dozen feet on the Providence side, from the ledge; that "the front end would be about opposite the barn where the door is, on the Harmony side." Later, on cross-examination he testified: "450 Q. That is your testimony, isn't it, opposite the corner of the barn nearest the Harmony Hotel? A. Yes, sir." Mr. White, the defendant, testified that the man who was struck came around the ledge onto the grass, "came along the road straight a very short distance and then immediately sprang into the middle of the road." This testimony of Mr. White indicates that the accident occurred eastward of the ledge. The collision evidently occurred near the ledge and the testimony places the automobile after the accident close to the ledge either on the road side of the ledge or, according to Picard about 12 feet eastward of the ledge. There is no testimony that the presence of the ledge affected the happening of the accident in any way, whether the collision occurred in the road beside the ledge or to the eastward of the ledge.

The third error alleged is the statement that "a place of danger, in the presence of the track lay on the southerly side." This statement is coupled by the judge with the statement in regard to the ledge upon the north side. From the testimony it appears that the railroad track at the place of the accident had been entirely completed, the rails laid, dirt filled in and rolled down to the level of the rails. The operation of electric cars upon the road had not commenced.

The fourth allegation of error is that "the court makes the further statement that 'there was a curve in the road.'" Counsel say there was none and refer to the engineer's drawing in evidence. The engineer's drawing appears to show a slight curve in the railroad track along by the Whipple barn, and also in the general direction of the road. Waterman, the engineer, testified, p. 242, "There is a slight curve about at the barn." The court's language was, "There is also a slight bend or curve in the road."

The fifth allegation of error is the judge's statement that "as the machine, moving at twelve miles an hour in the dark, arrived at the point where the men were, it made a turn into and among them." There was testimony which supported this statement. Maria testified that Nieddu was on his left side about two feet behind him; that when he saw the automobile it was right in the middle of the road and "all at once when we never expected, it turned right into us." Luigi testified that Nieddu was less than a meter from him on his left; that the automobile when he first saw it was coming straight and then it turned towards them; that he jumped onto the tracks. Nicolo testified that he was walking about a foot from the rail and was right in front of Nieddu; that when he first saw the automobile it was running in the middle of the road; that it so continued for about a second and then turned toward him and the other man. Picard, the chauffeur, also testified that he slightly turned to the left just before striking the man so as to allow a man who had crossed over to the chauffeur's right to have a little more room, "and as I got up to him, the first I knew which was about on the level with the top of the radiator was a dark form and as I saw it, it struck him between the two lights."

As to the sixth ground, defendant's counsel say in their brief: "On page 3 of the rescript; the court states, as to the witness Buxton, that he testified that *'the machine was only fifteen feet from the deceased when he first saw him dancing and swinging his arms,'* and that therefore Buxton *'had less than one second to observe the action of the deceased.'*" Counsel say that the witness did *not* testify as the court states.

According to the transcript the witness Buxton testified on direct examination: "Q. As the automobile approached, what did the Italians do ? A. Well, there were some going about on the right hand side of the road, and there was one across on the left hand side, and these on the right hand side got back onto the car track mostly, and the other one undertook to come across the road in front of the machine. Q. What did he do, if anything ? A. Well, I don't know

really what you would call it. He was prancing around and having a good time, and he got right out in front of the machine, and was going through some kind of a performance —I don't know just what you would call it. He was dancing around, having a good time. Q. How far away from him was the machine when, he got out in front of it? A. I should say pretty close. I couldn't say exactly. I could see him plainly on account of his being between me and the lights, but I should say/he was pretty close, perhaps twelve or fifteen feet, or such a matter. That would be my judgment." On cross-examination he said that he was about 150 feet from Whipple's house when he first saw the Italians; didn't notice the automobile at that time; drove along behind them; had not passed any before he got to this group; that they continued to walk along talking; that he noticed one out in the road farther than the others; that he did not notice the automobile at that time; that the man out in the road was somewhere between the hotel barn and the Whipple house, walking in the road, was going diagonally across the road; that he was walking and not running. The witness then testified in answer to questions as follows: "90 Q. Can you describe what he was doing? A. He was kind of parading. I should call it, dancing and jumping around and swinging his hands. 91 Q. Why did you say he was walking? Now you say he was dancing and jumping around. A. He was walking some of the time, and going through all kinds of motions. Call it what you like. 92 Q. I am not calling it anything. Tell the jury what it was. A. I am trying to. 93 Q. When you saw that man coming along the street did he go up onto the ledge? A. He went across the street; I couldn't say as he went up onto the ledge. He went off the street. 94 Q. And you don't know whether that was the man that was struck or not? A. No, sir, I couldn't say. 95 Q. It might be one of the other men that got down the road a little farther, might it not? A. No, sir. Those men kept on that side." "100 Q. And he kept dancing and walking along? A. Yes, sir." The witness

said in answer to Q. 198 that there was one other that was next to the car track that "was doing some kind of performance;" that he couldn't say that he saw the face of either of these men; that he stopped his horse when the man was struck, about 25 feet away. "201 Q. Did you say this man had gone over to the left hand side walking along that side of the road after that? A. On the left hand side? I did not notice him walking along; I saw him going across the street. "202 Q. You didn't see anything of him later on? A. I saw a man later on, saw one go across and come back. I don't know as it was the same man." "209 Q. Did he seem to come from the middle of the road? A. No, sir, he came from the side of the road." He testified that the machine was then close to him perhaps fifteen feet. "215 Q. Fifteen feet from you? A. I should say so. It is hard for me to judge in the position I was. 216 Q. Then there were fifteen feet between the man and the automobile which was coming at fifteen miles an hour, in which to stop? A. I should say so."

From this testimony the statement of the trial judge appears to be in substantial accord with the testimony of the witness on his direct examination, and also in accord with his testimony on cross-examination as to the time just prior to the collision. The witness however testified to certain actions of two men prior to that time farther back in the road, before he saw the automobile, but did not say that either of them was the man who was struck. On the contrary he distinctly said: "I don't know as it was the same man." We therefore cannot say that the language of the judge under consideration constituted a misstatement of the evidence.

We find only three of the allegations of error as to statements made by the judge in his decision which do not appear to be supported by evidence, viz.: (1) That "the defendant's chauffeur was in some hurry to get to Chepachet where he hoped to catch a conveyance to his home;" (2) that "the ledge prevented escape from the road on the northerly side;"

and (3) that "a place of danger in the presence of the track lay on the southerly side."

As to the first, the judge was mistaken as to the destination of the automobile. His remark as to the chauffeur being in a hurry was evidently his inference from the testimony as to speed and management of the automobile, and the place of destination.

As to the second, the place of the accident is not definitely fixed by the testimony with reference to the ledge. There is no testimony that the presence of the ledge affected the happening of the accident in any way, whether the collision occurred in the road beside the ledge or to the eastward of it.

(2)　　As to the third, the testimony is that dirt had been filled in between the rails and rolled down level with the rails. There was testimony that it was about as smooth as the rest of the road. The operation of electric cars upon the road had not commenced. We do not find that the characterization of the railroad by the judge as a place of danger is supported by the evidence.

Were these errors of statement, either or all of them, so material and controlling upon the judge's conclusion as to invalidate such conclusion and render his action pursuant thereto in granting a new trial clearly erroneous ?

The mistake as to the name of the village which was the destination of the automobile does not appear to us so material and controlling as to affect his decision. From the evidence, the ledge, whether opposite the place of accident or not, did not actually prevent the escape of any of the men from the road. The same is true as to the track. The roadway however need not be hemmed in by either of these in order to render the conduct of those in charge of the automobile or that of the men negligent or the contrary. While conditions outside of and beside the traveled way might enhance the danger from negligent management of a vehicle in the highway, which was such as.to necessitate the escape of travelers from the highway in order to avoid injury, the absence of those conditions would not relieve such conduct

of its negligent character . From our examination of the evidence, we cannot say, either that the judge was clearly in error in his conclusion that the verdict ought to be set aside, or that his conclusion in that regard was founded upon such material error as to what the evidence was as to render his decision pursuant thereto granting a new trial clearly erroneous.

The defendant's exception is overruled and the case is remitted to the Superior Court for a new trial in accordance with the decision of the trial justice.

*Easton, Williams & Rosenfeld,* for plaintiff.

*Boss & Barnefield,* for defendant.